# EXHIBIT A

## ASSIGNMENT AND ASSUMPTION AGREEMENT

For Ten Dollars and other good and valuable consideration, the receipt, adequacy and sufficiency of which is hereby acknowledged, Wells Street Companies ("Assignor"), does hereby assign, transfer and convey all of its right, title and interest in and to that certain Apartments/Investment Purchase and Sale Contract dated April 23, 2012, between Assignor and Northbrook Loans, LLC, a copy of which is attached hereto (the "Agreement"), relating to the acquisition of that certain real estate commonly known as 3337-41 N. Halsted, Chicago, Illinois, to Halsted Investment Partners, LLC, an Illinois limited liability company ("Assignee"), and Assignee does hereby assume all payments, terms and obligations arising under and in connection with the Agreement that may accrue subsequent to the date hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Assignment and Assumption Agreement as of the 17th day of July, 2013.

ASSIGNOR:

Wells Street Companies

By: _____
Arthur Holmer, Manager

ASSIGNEE:

Halsted Investment Partners, LLC

By: Wells Street Equities, LLC
Its: Manager

By: _____
Arthur Holmer, Manager



Doc#: 1312216077 Fee: $70.00
RHSP Fee:$10.00 Affidavit Fee:
Karen A. Yarbrough
Cook County Recorder of Deeds
Date: 05/02/2013 04:25 PM Pg: 1 of 17

## CHICAGO ASSOCIATION OF REALTORS APARTMENTS/INVESTMENTS PURCHASE AND SALE CONTRACT

Parties: By and between Owner of Record Northbrook Loans, LLC (Seller) and Wells Street Companies, Inc. (Buyer)

Property Address: 3335-37 North Halsted Street, Chicago, IL 60657 and
3339-41 North Halsted Street, Chicago, IL 60657

ATTACHMENTS TO THIS COVER PAGE INCLUDE – May 17, 2012 Michael J. Goldstein & Associates, Ltd. Attorney Modification Letter, May 14, 2012 Gussis Law Group LLC Attorney Modification Letter with Form of Estoppel and Chicago Association of Realtors Apartments/Investments Purchase and Sale Contract with Rider attached, Exhibit A Legal Descriptions

Cook County Recorder's Office. Please record the attached document(s).
Thank you.

Prepared by and Mail to: Glenn L. Udell
Brown, Udell, Pomerantz & Delrahim, Ltd.
1332 North Halsted Street, Suite 100
Chicago, Illinois 60642

"THE SIGNATURES OF THE PARTIES EXECUTING THIS DOCUMENT
ARE COPIES AND ARE NOT ORIGINAL SIGNATURES."

## EXHIBIT A - LEGAL DESCRIPTION

LOTS 8, 9 AND 10 TAKEN AS A TRACT (EXCEPT THE NORTH 38 FEET THEREOF) IN W.J. HAERTHER'S NORTH SHORE ADDITION IN PINE GROVE, A SUBDIVISION OF FRACTIONAL SECTION 21, TOWHSIP 40 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, MAP OF WHICH ADDITION WAS RECORDED SEPTEMBER 22, 1892 IN BOOK 56 OF PLATS, PAGE 32, IN COOK COUNTY, ILLINOIS.

PIN:  14-21-308-069-0000
Commonly known as:  3335-37 North Halsted Street, Chicago, IL  60657

THE NORTH 38 FEET OF LOTS 8, 9, AND 10, TAKEN AS A TRACT, IN W.J. HAERTHER'S NORTH SHORE ADDITION IN PINE GROVE, A SUBDIVISION OF FRACTIONAL SECTION 21, TOWNSHIP 40 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIN, MAP OF WHICH ADDITION WAS RECORDED SEPTEMBER 22, 1892 IN BOOK 56 OF PLATS, PAGE 32, IN COOK COUNTY, ILLINOIS

PIN:  14-21-308-070-0000
Commonly known as:  3339-41 North Halsted Street, Chicago, IL  60657



**Michael J. Goldstein & Associates, Ltd.**
Attorneys & Counselors at Law

May 17, 2012

Lloyd Gussis, Esq.
Gussis Law Group, LLC
6200 North Hiwatha Avenue
Suite 400
Chicago, Illinois 60646

*SENT VIA REGULAR U.S. MAIL & EMAIL: lloydgussis@msn.com*

    Re:    *3335-37 N. Halsted and 3339-41 N. Halsted, Chicago, IL*

Dear Lloyd:

    This letter is in response to yours dated May 14, 2012, proposing certain modifications on behalf of the Purchaser to the contract. Be advised as follows:

1. Seller agrees with paragraph 1 of your letter.

2. Seller agrees with paragraph 2 of your letter.

3. Seller agrees with paragraph 3 of your letter.

4. Seller agrees with paragraph 4(a) and paragraph 4(b) of your letter.

5. With regard to paragraph 5 of your letter, the Seller is not in control of either building at this time. Seller cannot represent that it will be able to provide the Buyer with an estoppel letter for each commercial tenant of the buildings.

6. Seller agrees with paragraph 6(a) of your letter. However, Seller does not agree with paragraph 6(b) of your letter. This is because the Seller does not wish to become obligated to Purchaser to pursue tenants for the closing month's rent after closing. In addition, the contract should clarify that claims for unpaid rents due for periods prior to closing are the property of Seller.

7. Seller agrees with paragraph 7 of your letter.

Lloyd Gussis
May 17, 2012
Page No. 2

8.  Seller agrees with paragraph 8 of your letter, subject to the time for providing the requested documentation being extended to ten (10) business days.

9.  Seller agrees with paragraph 9 of your letter.

10. Seller agrees with paragraph 10 of your letter.

11. Seller agrees with paragraph 11 of your letter.

12. Seller agrees with paragraph 12 of your letter.

13. Seller **does not** agree with paragraph 13 of your letter.

14. Seller agrees with paragraph 14 of your letter with this modification: Seller does not yet have *title* to either building, and so the contract must be contingent on Seller acquiring title to both properties.

If you have any questions or comments, please do not hesitate to communicate with me.

> Yours very truly,
>
> MICHAEL J. GOLDSTEIN & ASSOCIATES, LTD.
>
> Michael J. Goldstein

MJG:bb

Approved:
[signature] 5/18/12



## GUSSIS LAW GROUP LLC
### 6200 NORTH HIAWATHA AVENUE, SUITE 400
### CHICAGO, ILLINOIS 60646

LLOYD E. GUSSIS
DIRECT: 773-525-8036
FACSIMILE: 773-975-0944
LLOYDGUSSIS@MSN.COM

May 14, 2012

SAMUEL P. GUSSIS
DIRECT: 773-685-6920
FACSIMILE: 773-685-6740
SGUSSIS@GUSSISLAWGROUP.COM

Mr. Michael J. Goldstein, Esq.
Michael J. Goldstein & Associates Ltd.
17 North State Street
Suite 990
Chicago, Illinois   60602

                      RE: 3335-37 North Halsted and
                          3339-41 North Halsted
                          Chicago, Illinois

Dear Mr. Goldstein:

    Please be advised that the undersigned represents Wells Street Companies, Inc., the contract purchaser of the above entitled real estate. Pursuant to paragraph 14 of the Purchase and Sale Contract (the "Contract"), I am writing to advise you of my proposed modifications thereto.

    The following are my proposed modifications to the Contract:

    1. In the event that the parties are unable to finalize agreement as to (i) the proposed attorney modifications and/or (ii) any inspection issues within the time period(s) set forth in the Contract, the period(s) set forth in the Contract shall be extended until such time as the parties have reached written agreement with respect to such issues, agree that the parties are unable to reach agreement with respect to such issues or one party reasonably believes that agreement can not be reached with respect to such issues and so notifies the other party thereof in writing.

    2. It is agreed by the undersigned that the provisions of this letter will control in the event of a conflict with the provisions of the Contract.

    3. The parties agree that for all relevant purposes the date of acceptance of the Contract shall be May 1, 2012.

    4. With reference to paragraph 8:

        a. Buyer agrees to accept title to the real estate subject to covenants, conditions and restrictions of record, provided that the same do not interfere with or otherwise restrict the current use of the real estate.

        b. The following item shall be deleted: "all special

1

governmental taxes or assessments confirmed and unconfirmed."

5. With reference to paragraph 10, at closing Seller shall provide Buyer with an Estoppel Letter for each commercial tenant in the buildings in the form attached hereto as Exhibit "A".

6. With reference to paragraph A of the General Provisions:

    a. The parties agree that at the time of closing, Seller shall give Buyer a credit for the security deposit for each tenant, as set forth on each respective lease or certified rent roll, plus accrued interest thereon, and shall not use or apply any security deposit for delinquent rent of any tenant;

    b. Rents shall be prorated at closing based on rents actually collected by the Seller for the month in which the closing occurs. Any rent for the month of closing which is due but not yet collected shall not be prorated, but rather the parties will use their respective best efforts after the date of closing to collect such rent, and upon collection of same, shall be prorated between the parties.

7. With reference to paragraph C of the General Provisions, Seller agrees that he shall obtain extended coverage over the general exceptions contained in the title commitment.

8. Seller agrees to provide Buyer, within five (5) business days of the date of acceptance hereof, with (i) a certified rent roll (setting forth the name of each tenant, the monthly rent, security deposit, and if there is a written lease for such tenant, and if so, the term of the lease, or if not, whether such tenancy is month to month); (ii) laundry room leases, if any; (iii) management agreements, if any; and (iv) all contracts or agreements which in any way affect the operation of the real estate. This Contract is contingent upon the review and approval of said documentation by Buyer within four (4) business days from the date of receipt of said documentation by Buyer.

9. Seller agrees that between the date hereof and the date of closing, he shall not enter into any additional leases or tenancies without the prior written approval of the Buyer.

10. This Contract shall be contingent upon Seller delivering to Buyer zoning certifications from the City of Chicago evidencing that there are four (4) legal dwelling units in each of the buildings.

11. With reference to paragraph J of the General Provisions, the survey to be provided by Seller for each property shall be an ALTA survey and shall evidence that there are no encroachments or violations of any building line which can not be "insured" by the

2

title insurer for the owners policy of title insurance.

12. With reference to paragraph O of the General Provisions, the City of Chicago transfer stamps shall be paid as follows: $7.50/$1,000.00 in purchase price by Buyer and $3.00/$1,000.00 in purchase price by Seller.

13. With reference to paragraph Q of the General Provisions, the last sentence thereof shall be deleted.

14. With reference to Rider A:

    a. The parties acknowledge and agree that the contract is for the purchase and sale of two buildings, being (i) 3335-37 North Halsted, Chicago, Illinois; and (ii) 3339-41 North Halsted, Chicago, Illinois.

    b. Buyer acknowledges that Seller does not yet have title to the 3339-41 North Halsted, Chicago, Illinois building. The contract is contingent upon Seller acquiring title to said real estate and simultaneously closing on both properties.

    c. Seller agrees to give Buyer written notice of the date of the sheriff sale for 3339-41 North Halsted, Chicago, Illinois. Notwithstanding anything to the contrary contained herein, Buyer shall have the right to attend said sheriff sale and in the event that there is a bid on the property in excess of the Seller's bid, Buyer shall have the right to also bid on the property. In the event that the Buyer is the highest bidder at the sheriff's sale, the parties will then close on the purchase and sale of 3335-37 North Halsted, Chicago, Illinois, as set forth in the contract, with the purchase price reduced by the amount of Buyer's successful bid at the sheriff's sale for 3339-41 North Halsted.

    d. The parties agree that in the event that both the Seller and the Buyer fail to acquire title to the 3339-41 North Halsted property, the contract shall be null and void and Buyer shall be entitled to the return of its earnest money deposit.

The above modifications shall in not be construed as a counter-offer, but rather as suggested modifications of the Contract which the Buyer reserves the right to withdraw, in whole or in part, if not agreed to by the Seller.

If your client is in agreement with the foregoing modifications, please sign and return a copy of this letter to me.

If your client does not agree with these modifications, please contact me at your earliest convenience so that we might discuss these issues and attempt to resolve them in a manner

3

satisfactory to the parties.

Very truly yours,

Lloyd M. Gussis

leg/em
cc: Wells Street Companies, Inc.

VIA FACSIMILE AND REGULAR MAIL

MODIFICATIONS APPROVED: The undersigned, as attorney of record, has the authority to bind his client to the foregoing modifications to the Contract and hereby approves same.

_____
Attorney for Seller

4

Form of Estoppel

**ESTOPPEL CERTIFICATE**

To:   [Name of Buyer]
      c/o_____

      _____
      _____

      Attn:_____

Property Address:

The undersigned tenant (the "tenant") hereby certifies to you as follows:

(1)   tenant is the tenant at the Property under a lease for the Property dated _____, (the "Lease") with _____ (the "Landlord"), containing _____ square feet; such lease has not been canceled, modified, extended or amended by any amendment, letter, or other written or oral agreement or understanding, except as stated above.

(2)   Landlord has timely completed all of its obligations under the Lease, including without limitation, those relating to construction of the Property, and has paid tenant all allowances and other amounts (if any) due to tenant under the Lease, except as hereinafter otherwise specified, and tenant has no claims against Landlord, except as follows [state "none" if applicable]: _____.

(3)   All base rent, rent escalations and additional rent under the Lease and all other amounts due from tenant to Landlord under the Lease have been paid through _____, 20\_\_. There is no prepaid rent, except for the current month, and the amount of security deposit is $_____. The security deposit is cash and no interest accrues or is due thereon. tenant is not entitled to any rental abatement or "free rent" or other offset against rent under the Lease which has not already been received by tenant, except as follows [state "none" if applicable]: _____.

Base rent is payable as follows: currently _____ - per month, escalating _____%
annually commencing _____, and tenant is obligated to pay 100% of the real estate taxes and assessments, insurance, common area maintenance and other operating expenses payable with respect to the Property in monthly installments, as provided under the Lease. Tenant's 100% share of (i) Impositions are currently being paid in the monthly amount of

B-1

$_____ and (ii) Common Area Costs are currently being paid in the amount of _____.

(4) The term of the Lease expires on _____, subject to tenant's early termination right described below. Except as noted below, tenant has not been granted: (a) any right or option to extend the term of the Lease; (b) any right or option to expand the Property or to lease additional space within the Property; (c) any right of refusal, offer or opportunity on any space at the Property; (d) any right or option to purchase the Property or the Property, or any part thereof; or (e) any right or option to terminate the Lease prior to its stated expiration date or to reduce the size of the Property. Notwithstanding the foregoing, tenant has the following options of the type described in clauses (a) - (e) above [state "none" if applicable]: _____.

(5) (a) The Lease is in full force and effect; (b) the Lease is free from breach or default and free from any event by either Landlord or tenant which could become a breach or default under the Lease; and (c) tenant has no claims against the Landlord and tenant has no offsets or defenses against rent or tenant's obligations under the Lease.

(6) tenant has received no notice and has no knowledge of any prior sale, transfer or assignment, hypothecation or pledge of the Lease or of the rents payable under the Lease, except as follows [state "none" if applicable]: _____.

(7) tenant has full possession of and tenant is currently occupying the Property, has not assigned the Lease or sublet any part of the Property and does not hold the Property (or any part thereof) under an assignment or sublease, except as follows [state "none" if applicable]: _____.

(8) Tenant is not insolvent or bankrupt or otherwise unable to pay its debts as they mature.

(9) Tenant does not own any fixtures or equipment in the Premises, except for tenant's movable trade fixtures, and except for the following items: _____.

The undersigned has executed this Estoppel Certificate with the knowledge and understanding that _____, or an affiliate or assignee thereof, is acquiring the Property, n, in reliance on this Estoppel Certificate. Each person signing this Estoppel Certificate for tenant is duly authorized to bind tenant and each person signing this Estoppel Certificate for Guarantor is duly authorized to bind Guarantor. The statements contained herein may be relied upon by _____, and any affiliates or assignees thereof, and any mortgagee of the Property.

Dated this \_\_\_\_ day of _____, 20\_\_.

B-2

**TENANT:**

_____

By: _____
Title: _____

B-3





## CHICAGO ASSOCIATION OF REALTORS®
## APARTMENTS/INVESTMENTS PURCHASE AND SALE CONTRACT
Rev. 01/2008

1. **Contract.** This Apartment/Investments Purchase and Sale Contract ("*Contract*") is made by and between Wells Street Companies or "Assignee" ("*Buyer*") and Owner of Record ("*Seller*") (collectively, "*Parties*"), with respect to the purchase and sale of the real estate and improvements located at 3335-37 & 3339-41 N. Halsted, Chicago, IL 60657 ("*Property*")
(address) (and #) (city) (State) (zip)

6. Property P.I.N. # 14-21-308-(069,070)-0000 . Lot size: 80 x 110 . Approximate square feet of Property: 19,400

2. **Fixtures and Personal Property.** At Closing (as defined in Paragraph 7 of this Contract), in addition to the Property, Seller shall transfer to Buyer by a Bill of Sale, all heating, cooling, electrical and plumbing systems, together with the following checked and enumerated items ("*Fixtures and Personal Property*"):

- ☑ Refrigerator*
- ☐ Sump Pump
- ☑ Central air conditioner*
- ☐ Fireplace screen and equipment
- ☐ Built-in or attached shelves or cabinets
- ☑ Oven/Range*
- ☐ Smoke and carbon monoxide detectors
- ☐ Window air conditioner
- ☐ Fireplace gas log
- ☐ Ceiling fan
- ☑ Microwave*
- ☐ Electronic air filter
- ☐ Firewood
- ☐ Radiator covers
- ☑ Dishwasher*
- ☐ Intercom system
- ☐ Central humidifier
- ☐ Attached gas grill
- ☐ All planted vegetation
- ☐ Garbage disposal
- ☐ Security system (rented or owned) (strike one)
- ☐ Lighting fixtures
- ☐ Existing storms and screens
- ☐ Outdoor play set/swings
- ☐ Trash compactor
- ☐ Satellite Dish
- ☐ Electronic garage door(s) with ___ remote unit(s)
- ☐ Outdoor shed
- ☑ Washer*
- ☐ T.V. antenna
- ☐ Window treatments
- ☑ Dryer*
- ☐ LCD/plasma/multimedia equipment
- ☐ Wall-to-wall carpeting
- ☐ Home warranty (see attached)
- ☐ Water Softener
- ☐ Stereo speakers/surround sound

19. Seller also transfers the following: N/A ___ The following items are excluded: N/A

20. 3. **Purchase Price.** The purchase price for the Property (including the Fixtures and Personal Property) is $ 3,500,000 ("*Purchase Price*").

22. 4. **Earnest Money.** Upon Buyer's execution of this Contract, Buyer shall deposit with Chicago Title & Trust Company ("*Escrowee*"), initial earnest money in the amount of $ 50,000 , in the form of Check ("*Initial Earnest Money*"). The Initial Earnest Money shall be returned and this Contract shall be of no force or effect if this Contract is not accepted by Seller on or before April 28th , 20 12 . The Initial Earnest Money shall be increased to (strike one) 10% of the Purchase Price OR $ 100,000 ("*Final Earnest Money*") within 2 business days after the expiration of the Attorney Approval Period (as established in Paragraph 14 of this Contract) (the Initial and Final Earnest Money are together referred to as the "*Earnest Money*"). The Parties acknowledge and agree that (i) the Parties shall execute all necessary documents with respect to the Earnest Money in form and content mutually agreed upon between the parties and (ii) except as otherwise agreed, Buyer shall pay all expenses with respect to the Earnest Money.

30. 5. ~~Mortgage Contingency. This Contract is contingent upon Buyer securing by ___ 20 ___ ("*First Commitment Date*") a firm written mortgage commitment for a fixed-rate or an adjustable-rate mortgage permitted to be made by a U.S. or Illinois savings and loan association, bank or other authorized institution, in the amount of $ ___ , the interest rate (or initial interest rate if an adjustable rate mortgage) not to exceed ___ % per year, amortized over ___ years, payable monthly, loan fee not to exceed ___ %, plus appraisal and credit report fee, if any ("*Required Commitment*"). If the mortgage secured by the Required Commitment has a balloon payment, it shall be due no sooner than ___ years. Buyer shall pay for private mortgage insurance as required by the lending institution. If a FHA or VA mortgage is to be obtained, Rider 8, Rider 9, or the HUD Rider shall be attached to this Contract. (1) If Buyer is unable to obtain the Required Commitment by the First Commitment Date, Buyer shall so notify Seller in writing on or before that Date. Thereafter, Seller may, within 30 business days after the First Commitment Date ("*Second Commitment Date*"), secure the Required Commitment for Buyer upon the same terms, and may extend the Closing Date by 30 business days. The Required Commitment may be given by Seller or a third party. Buyer shall furnish all requested credit information, sign customary documents relating to the application and securing of the Required Commitment, and pay one application fee as directed by Seller. Should Seller choose not to secure the Required Commitment for Buyer, this Contract shall be null and void as of the First Commitment Date, and the Earnest Money shall be returned to Buyer. (2) If Buyer notifies Seller on or before the First Commitment Date that Buyer has been unable to obtain the Required Commitment, and neither Buyer nor Seller secures the Required Commitment on or before the Second Commitment Date, this Contract shall be null and void and the Earnest Money shall be returned to Buyer. (3) If Buyer does not provide any notice to Seller by the First Commitment Date, Buyer shall be deemed to have waived this contingency and this Contract shall remain in full force and effect.~~

46. 6. **Possession.** Seller agrees to surrender possession of the Property on or before the Closing Date (as defined in Paragraph 7 below). If possession is not delivered on or prior to the Closing Date, then Seller shall pay to Buyer at Closing $ N/A ___ per day ("*Use/Occupancy Payments*") for Seller's use and occupancy of the Property for each day after the Closing Date through and including the day Seller pays to deliver possession to Buyer ("*Possession Date*"). If Seller delivers possession of the Property to Buyer prior to the Possession Date, Buyer shall refund the portion of Use/Occupancy Payments which extend beyond the date possession is actually surrendered. Additionally, Seller shall deposit with Escrowee a sum equal to 2% of the Purchase Price ("*Possession Escrow*") to guarantee possession on or before the Possession Date, which sum shall be held from the net proceeds at Closing on Escrowee's form of receipt. If Seller does not surrender the Property on the Possession Date, Seller shall pay to Buyer, in addition to all Use/Occupancy Payments, the sum of 10% of the original amount of the Possession Escrow per day up to and including the day possession is surrendered to Buyer plus any unpaid Use/Occupancy Payments up to and including the date possession is surrendered, these amounts to be paid out of the Possession Escrow and the balance, if any, to be returned to Seller. Acceptance of payments by Buyer shall not limit Buyer's other legal remedies. Seller and Buyer hereby acknowledge that Escrowee shall not distribute the Possession Escrow without the joint written direction of Seller and Buyer. If either Party objects to disposition of the Possession Escrow, then Escrowee may deposit the Possession Escrow with the Clerk of the Circuit Court by the filing of an action in the nature of an Interpleader. Escrowee shall be reimbursed from the Possession Escrow for all costs, including reasonable attorneys' fees, related to the filing of the Interpleader, and the Parties shall indemnify and hold Escrowee harmless from any and all claims and demands, including the payment of reasonable attorneys' fees, costs, and expenses.

61. 7. **Closing.** Buyer shall deliver the balance of the Purchase Price (less the amount of the Final Earnest money, plus or minus prorations and escrow fees, if any) to Seller and Seller shall execute and deliver the Deed (as defined below) to Buyer at "*Closing*". Closing shall occur on or prior to See Rider A , 20 ___ at a time and location mutually agreed upon by the Parties ("*Closing Date*"). Seller must provide Buyer with good and merchantable title prior to Closing.

Buyer Initials: ___   Buyer Initials ___                                      Seller Initials: RSR   Seller Initials ___

65  8. **Deed.** At Closing, Seller shall execute and deliver to Buyer, or cause to be executed and delivered to Buyer, a recordable warranty deed
66  ("*Deed*") (or other appropriate deed if title is in trust or in an estate), or Articles of Agreement, if applicable, subject only to the following, if any:
67  covenants, conditions, and restrictions of record; public and utility easements; acts done by or suffered through Buyer; existing leases and tenancies,
68  if any; all special governmental taxes or assessments confirmed and unconfirmed; and general real estate taxes not yet due and payable at the time of
69  Closing.

70  9. **Real Estate Taxes.** Seller represents that the 2010 general real estate taxes were $56,235_____. General real estate taxes for the
71  Property are subject to the following exemptions (*check box if applicable*): ☐ Homeowner's. ☐ Senior Citizen's. ☐ Senior Freeze. General real
72  estate taxes shall be prorated based on (i) 115 % of the most recent ascertainable full year tax bill, or (ii) mutually agreed by the Parties in
73  writing prior to the expiration of the Attorney Approval Period.

74  10. **Leases.** Seller shall deliver to Buyer a complete copy of all existing leases affecting the Property and a rent roll within 3 business days of the
75  Acceptance Date. Seller represents and warrants that (a) existing leases, if any, will be assigned to Buyer at Closing in an assignment and
76  assumption agreement mutually agreeable to the Parties and (b) the present monthly gross rental income is $39,635_____.
77  Seller shall notify Buyer, prior to Closing, of any (i) new leases; (ii) modifications or amendments to the existing leases; and (iii) changes in the
78  monthly gross rental income.

79  11. **Disclosures.** Buyer has received the following (*check yes or no*): (a) Residential Real Property Disclosure Report: ☐ Yes/☒ No; (b) Heat
80  Disclosure: ☐ Yes/☒ No; (c) Lead Paint Disclosure and Pamphlet: ☐ Yes/☒ No; (d) Radon Disclosure and Pamphlet: ☐ Yes/☒ No; and (e) Zoning
81  Certification: ☐ Yes/☒ No.

82  12. **Zoning Certification.** If the Property is located in the City of Chicago and contains four dwelling units or less, Seller shall provide zoning
83  certification to Buyer at least 5 days prior to the Closing Date.

84  13. ~~Dual Agency. The Parties confirm that they have previously consented to _____ ("Licensee") to act as Dual~~
85  ~~Agent in providing brokerage services on behalf of the Parties and specifically consent to Licensee acting as Dual Agent on the transaction covered by~~
86  ~~this Contract.~~
87  ~~Buyer Initials:_____  Buyer Initials:_____  Seller Initials:_____  Seller Initials:_____~~

88  14. **Attorney Modification.** Within 10 business days after the Acceptance Date ("*Attorney Approval Period*"), the Parties' respective attorneys
89  may propose written modifications to this Contract ("*Proposed Modifications*") on matters other than the Purchase Price, broker's compensation
90  and dates. Any Proposed Modifications that are set forth in writing and accepted by the other party shall become terms of this Contract as if
91  originally set forth in this Contract. If within the Attorney Approval Period, the Parties cannot reach agreement regarding the Proposed
92  Modifications, then, at any time after the Attorney Approval Period, either Party may terminate this Contract by written notice to the other Party. In
93  that event, this Contract shall be null and void and the Earnest Money shall be returned to Buyer. IN THE ABSENCE OF DELIVERY OF
94  PROPOSED MODIFICATIONS PRIOR TO THE EXPIRATION OF THE ATTORNEY APPROVAL PERIOD, THIS PROVISION SHALL BE
95  DEEMED WAIVED BY ALL PARTIES, AND THIS CONTRACT SHALL BE IN FULL FORCE AND EFFECT.

96  15. **Inspection.** Within 10 business days after the Acceptance Date ("*Inspection Period*"), Buyer may conduct, at Buyer's sole cost and expense
97  (unless otherwise provided by law) home, radon, environmental, lead-based paint and/or lead-based paint hazards (unless separately waived), wood
98  infestation, and/or mold inspections of the Property ("*Inspections*") by one or more properly licensed or certified inspection personnel (each, an
99  "*Inspector*"). The Inspections shall include only major components of the Property, including, without limitation, central heating, central cooling,
100 plumbing, well, and electric systems, roofs, walls, windows, ceilings, floors, appliances, and foundations. A major component shall be deemed to be in
101 operating condition if it performs the function for which it is intended, regardless of age, and does not constitute a health or safety threat. Buyer
102 shall indemnify Seller from and against any loss or damage to the Property or personal injury caused by the Inspections, Buyer, or Buyer's Inspector.
103 Prior to expiration of the Inspection Period, Buyer shall notify Seller or Seller's attorney in writing ("*Buyer's Inspection Notice*") of any defects
104 disclosed by the Inspections that are unacceptable to Buyer, together with a copy of the pertinent pages of the relevant inspections report. Buyer
105 agrees that minor repairs and maintenance costing less than $250 shall not constitute defects covered by this Paragraph. If the Parties have not
106 reached written agreement resolving the inspection issues within the Inspection Period, then either Party may terminate this Contract by written
107 notice to the other Party. In the event of such notice, this Contract shall be null and void and the Earnest Money shall be returned to Buyer. IN THE
108 ABSENCE OF WRITTEN NOTICE PRIOR TO EXPIRATION OF THE INSPECTION PERIOD, THIS PROVISION SHALL BE DEEMED WAIVED
109 BY ALL PARTIES, AND THIS CONTRACT SHALL BE IN FULL FORCE AND EFFECT.

110 16. **General Provisions and Riders.** THIS CONTRACT WILL BECOME A LEGALLY BINDING CONTRACT WHEN SIGNED BY
111 BUYER AND SELLER AND DELIVERED TO BUYER OR BUYER'S DESIGNATED AGENT. THIS CONTRACT INCLUDES THE GENERAL
112 PROVISIONS ON THE LAST PAGE OF THIS CONTRACT AND RIDERS A _____ (*list Rider numbers here*) AND
113 ADDENDUM _____ (*list Addendum numbers here*) ATTACHED TO AND MADE A PART OF THIS CONTRACT.

[SIGNATURE PAGE FOLLOWS]



Buyer Initials:_____  Buyer Initials:_____       2 of 4       Seller Initials:_____  Seller Initials:_____

| | |
|---|---|
| 113 OFFER DATE: April 23rd _____ 20 12 ____ | ACCEPTANCE DATE: _____ 20__ ("Acceptance Date") |

114
115 BUYER'S INFORMATION:
115 Buyer's Signature: [signature]
117 Buyer's Signature: _____

118 Buyer's Name(s) (print): ~~Arthur Holmer~~ Wells Street Companies or Assignee
119 Address: 343 W. Erie, Suite 420
120 City: Chicago  State: IL  Zip: 60654

121 Office Phone: 312-274-0533  Home Phone: _____
122 Fax: 312-276-4711  Cell Phone: _____
123 Email Address: arthur.holmer@wellscompanies.com

124 The names and addresses set forth below are for informational purposes
125 to change.

126 BUYER'S BROKER'S INFORMATION:

127 Designated Agent (print): _____
128 Agent Identification Number: _____
129 Broker Name: _____ MLS #: _____

130 Office Address: _____
131 City: _____ State: _____ Zip: _____
132 Office Phone: _____ Cell Phone: _____
133 Fax: _____
134 Email: _____

135 BUYER'S ATTORNEY'S INFORMATION:

136 Attorney Name: _____
137 Firm: _____
138 Office Address: _____
139 City: _____ State: _____ Zip: _____
140 Office Phone: _____ Cell Phone: _____
141 Fax: _____
142 Email: _____

143 BUYER'S LENDER'S INFORMATION:

144 Mortgage Broker's Name: None
145 Lender: _____
146 Office Address: _____
147 City: _____ State: _____ Zip: _____
148 Office Phone: _____ Cell Phone: _____
149 Fax: _____
150 Email: _____

SELLER'S INFORMATION:
Seller's Signature: RSR [signature]
Seller's Signature: _____

Seller's Name(s) (print): Northbrook Loans, LLC
Address: 500 Skokie Blvd, Suite 280
City: Northbrook  State: IL  Zip: 60062

Office Phone: 847-557-1002  Home Phone: _____
Fax: _____  Cell Phone: _____
Email Address: bshibe@diagrp.com

The names and addresses set forth below are for informational purposes only and subject
only and subject to change.

SELLER'S BROKER'S INFORMATION:

Designated Agent Name (print): _____
Agent Identification Number: _____
Broker Name: _____ MLS #: _____

Office Address: _____
City: _____ State: _____ Zip: _____
Office Phone: _____ Cell Phone: _____
Fax: _____
Email: _____

SELLER'S ATTORNEY'S INFORMATION:

Attorney Name: _____
Firm: _____
Office Address: _____
City: _____ State: _____ Zip: _____
Office Phone: _____ Cell Phone: _____
Fax: _____
Email: _____

Buyer Initials _____ Buyer Initials _____   7 of 8   Seller Initials RSR [initials]  Seller Initials _____

151 **GENERAL PROVISIONS**

152   A.   **Prorations.** Rents, interest on existing mortgage, if any, water taxes and other items shall be prorated as of the Closing Date. Security deposits and required interest, if
153   any, shall be paid to Buyer at Closing. Notwithstanding anything to the contrary contained in Paragraph 9 of this Contract, if the Property is improved as of the Closing Date but the
154   last available tax bill is on vacant land, Seller shall place in escrow an amount equal to 2% of the Purchase Price and the Parties shall reprorate taxes within 30 days after the bill on
155   the improved property becomes available.

156   B.   **Uniform Vendor and Purchaser Risk Act.** The provisions of the Uniform Vendor and Purchaser Risk Act of the State of Illinois shall be applicable to this Contract.

157   C.   **Title.** At least 5 days prior to the Closing Date, Seller shall deliver to Buyer or his agent evidence of merchantable title to the intended grantee by delivering a
158   Commitment for Title Insurance of a title insurance company bearing a date on or subsequent to the Acceptance Date in the amount of the Purchase Price, subject to no other
159   exceptions than those previously listed within this Contract and to general exceptions contained in the commitment. Delay in delivery by Seller of a Commitment for Title Insurance
160   due to delay by Buyer's mortgagee in recording mortgage and bringing down title shall not be a default of this Contract. Every Commitment for Title Insurance furnished by Seller
161   shall be conclusive evidence of title as shown. If evidence of title discloses other exceptions, Seller shall have 30 days after Seller's receipt of evidence of title to cure the exceptions and
162   notify Buyer accordingly. As to those exceptions that may be removed at Closing by payment of money, Seller may have those exceptions removed at Closing by using the proceeds of
163   the sale.

164   D.   **Notice.** All notices required by this Contract shall be in writing and shall be served upon the Parties or their attorneys at the addresses provided in this Contract. The
165   mailing of notice by registered or certified mail, return receipt requested, shall be sufficient service when the notice is mailed. Notices may also be served by personal delivery or
166   commercial delivery service, by mail-o-gram, telegram, or by the use of a facsimile machine with proof of transmission and a copy of the notice with proof of transmission being sent by
167   regular mail on the date of transmission. In addition, facsimile signatures shall be sufficient for purposes of executing, negotiating and finalizing this Contract. E-mail notices shall be
168   deemed valid and received by the addressee when delivered by e-mail and opened by the recipient, provided that a copy of the e-mail notice is also sent by regular mail to the recipient
169   on the date of transmission.

170   E.   **Disposition of Earnest Money.** In the event of default by Buyer, the Earnest Money, less expenses and commission of the listing broker shall be paid to Seller. If Seller
171   defaults, the Earnest Money, at the option of Buyer, shall be refunded to Buyer, but such refunding shall not release Seller from the obligations of this Contract. In the event of any
172   default, Escrowee shall give written notice to Seller and Buyer indicating Escrowee's intended disposition of the Earnest Money and request Seller's and Buyer's written consent to the
173   Escrowee's intended disposition of the Earnest Money within 30 days after the notice. However, Seller and Buyer acknowledge and agree that if Escrowee is a licensed real estate
174   broker, Escrowee may not distribute the Earnest Money without the joint written direction of Seller and Buyer or their authorized agents. If Escrowee is not a licensed real estate
175   broker, Seller and Buyer agree that if neither Party objects, in writing, to the proposed disposition of the Earnest Money within 30 days after the date of the notice, then Escrowee shall
176   proceed to disburse the Earnest Money as previously noticed by Escrowee. If either Seller or Buyer objects to the intended disposition within the 30 day period or if Escrowee is a
177   licensed real estate broker and does not receive the joint written direction of Seller and Buyer authorizing distribution of the Earnest Money, then the Escrowee may deposit the
178   Earnest Money with the Clerk of the Circuit Court by the filing of an action in the nature of an Interpleader. Escrowee may be reimbursed from the Earnest Money for all costs,
179   including reasonable attorney's fees, related to the filing of the Interpleader and the Parties indemnify and hold Escrowee harmless from any and all claims and demands, including the
180   payment of reasonable attorneys' fees, costs, and expenses arising out of those claims and demands.

181   F.   **Operational Systems.** Seller represents that the heating, plumbing, electrical, central cooling, ventilating systems, appliances and fixtures on the Property are in
182   working order and will be so at the time of Closing and that the roof is free of leaks and will be so at the time of Closing. Buyer shall have the right to enter the Property during the 48-
183   hour period immediately prior to Closing solely for the purpose of verifying that the operational systems and appliances serving the Property are in working order and that the Property
184   is in substantially the same condition, normal wear and tear excepted, as of the Acceptance Date.

185   G.   **Insulation Disclosure Requirements.** If the Property is new construction, Buyer and Seller shall comply with all insulation disclosure requirements as provided by the
186   Federal Trade Commission and Rider 13 is attached.

187   H.   **Code Violations.** Seller warrants that no notice from any city, village or other governmental authority of a dwelling code violation that currently exists on the Property
188   has been issued and received by Seller or Seller's agent ("Code Violation Notice"). If a Code Violation Notice is received after the Acceptance Date and before Closing, Seller shall
189   promptly notify Buyer of the Notice.

190   I.   **Escrow Closing.** At the written request of Seller or Buyer received prior to the delivery of the deed under this Contract, this sale shall be closed through an escrow with a
191   title insurance company, in accordance with the general provisions of the usual form of deed and money escrow agreement then furnished and in use by the title insurance company,
192   with such special provisions inserted in the escrow agreement as may be required to conform with this Contract. Upon the creation of an escrow, payment of Purchase Price and
193   delivery of deed shall be made through the escrow. This Contract and the Earnest Money shall be deposited in the escrow and the Broker shall be made a party to the escrow with
194   regard to commission due. The cost of the escrow shall be divided equally between Buyer and Seller.

195   J.   **Survey.** At least 5 days prior to the Closing Date, Seller shall provide Buyer with a survey by a licensed land surveyor dated not more than six months prior to the date of
196   Closing, showing the present location of all improvements. If Buyer or Buyer's mortgagee desires a more recent or extensive survey, the survey shall be obtained at Buyer's expense.

197   K.   **Affidavit of Title; ALTA.** Seller agrees to furnish to Buyer an affidavit of title subject only to those items set forth in this Contract, and an ALTA form if required by
198   Buyer's mortgagee or the title insurance company, for extended coverage.

199   L.   **Legal Description.** The Parties may amend this Contract to attach a complete and correct legal description of the Property.

200   M.   **RESPA.** Buyer and Seller shall make all disclosures and do all things necessary to comply with the applicable provisions of the Real Estate Settlement Procedures Act of
201   1974, as amended.

202   N.   **1031 Exchange.** The Parties agree that at any time prior to the Closing Date, Buyer and/or Seller may elect to effect a simultaneous or non-simultaneous tax-deferred
203   exchange pursuant to Section 1031, and the regulations pertaining thereto, of the Internal Revenue Code, as amended. Each party expressly agrees to cooperate with the other party in
204   connection with any such exchange in any manner which shall not impose any additional cost or liability upon the cooperating party, including without limitation, by executing any
205   and all documents including escrow instructions or agreements consenting to the assignment of any rights and obligations hereunder to an exchange entity, which may be necessary to
206   carry out such an exchange; provided, however, that any election to effect such an exchange shall not delay the Closing Date.

207   O.   **Transfer Taxes.** Seller shall pay the amount of any state tax imposed by the state and county on the transfer of title, and shall furnish a completed declaration signed by
208   Seller or Seller's agent in the form required by the state and county, and shall furnish any declaration signed by Seller or Seller's agent or meet other requirements as established by
209   any local ordinance with regard to a transfer or transaction tax. Any real estate transfer tax required by local ordinance shall be paid by the person designated in that ordinance.

210   P.   **Removal of Personal Property.** Seller shall remove from the Property by the Possession Date all debris and Seller's personal property not conveyed by Bill of Sale to
211   Buyer.

212   Q.   **Surrender.** Seller agrees to surrender possession of the Property in the same condition as it is on the Acceptance Date, ordinary wear and tear excepted, subject to
213   Paragraph B of the General Provisions of this Contract. To the extent that Seller fails to comply with this Provision, Seller shall not be responsible for that portion of the total cost
214   caused by this violation that is below $250.00.

215   R.   **Time.** Time is of the essence for purposes of this Contract.

216   S.   **Number.** Wherever appropriate within this Contract, the singular includes the plural.

217   T.   **Flood Plain Insurance.** In the event the Property is in a flood plain and flood insurance is required by Buyer's lender, Buyer shall pay for that insurance.

218   U.   **Business Days and Time.** Any reference in this Contract to "day" or "days" shall mean business days, not calendar days, including Monday, Tuesday, Wednesday,
219   Thursday, and Friday, and excluding all official federal and state holidays.

220   V.   **Patriot Act.** Seller and Buyer represent and warrant that they are not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by
221   Executive Order or the United States Treasury Department as a Specially Designated National and Blocked Person, or other banned or blocked person, entity, nation or transaction
222   pursuant to any law, order, rule or regulation which is enforced or administered by the Office of Foreign Assets Control ("OFAC"), and that they are not engaged in this transaction
223   directly or indirectly on behalf of, or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity, or nation. Each Party shall defend, indemnify and
224   hold harmless the other Party from and against any and all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorneys' fees and costs) arising from or
225   related to any breach of the foregoing representation and warranty.

226   W.   **Brokers.** The real estate brokers named in this Contract shall be compensated in accordance with their agreements with their clients and/or any offer of compensation
227   made by the listing broker in a multiple listing service in which the listing and cooperating broker both participate.

228   X.   **Original Executed Contract.** The listing broker shall hold the original fully executed copy of this Contract.

Buyer Initials _____ Buyer Initials _____          Seller Initials _____ Seller Initials _____

4 of 5

### RIDER A

1. The buyer will waive all buyer contingencies after the ten (10) business day attorney approval and inspection period.
2. After the ten (10) business day attorney approval period, the contract is contingent upon seller obtaining title on the 3337-39 N. Halsted property through a sheriff sale and consequently closing on the sale of both properties to buyer within thirty calendar days after the sheriff sale date.
3. The closing on both properties will occur simultaneously.